# EXHIBIT 1

*DARREN KELLY*

## Employment Agreement

This Employment Agreement (the "**Agreement**") is made and entered into as of the Effective Date, by and among Darren Kelly (the "**Executive**"), Effyis, Inc., a Michigan corporation (the "**Company**"), and Hotto Link Inc., a Japanese corporation (the "**Guarantor**").

WHEREAS, the Company desires to employ the Executive on the terms and conditions set forth herein; and

WHEREAS, the Executive desires to be employed by the Company on such terms and conditions.

NOW, THEREFORE, in consideration of the mutual covenants, promises and obligations set forth herein, the parties agree as follows:

1. <u>Term</u>. The Executive's employment hereunder shall be effective as of the closing of the acquisition of the Company (the "**Acquisition**") provided for in the Amendment and Restatement of that Certain Agreement and Plan of Merger as Stock Purchase Agreement, dated December 18, 2014, among the Guarantor, Effyis Acquisition Inc., Darren Kelly and Scott Purdon (the "**Definitive Agreement**") (such date, the "**Effective Date**") and shall continue until the fourth anniversary thereof, unless terminated earlier pursuant to **Section 5** of this Agreement; provided that, on such fourth anniversary of the Effective Date and each annual anniversary thereafter (such date and each annual anniversary thereof, a "**Renewal Date**"), the Agreement shall be deemed to be automatically extended, upon the same terms and conditions for successive periods of one year, unless either party provides written notice of its intention not to extend the term of the Agreement at least 45 days' prior to the applicable Renewal Date. If the Definitive Agreement terminates for any reason before the Acquisition is consummated, all the provisions of this Agreement will terminate and there will be no liability of any kind under this Agreement. The period during which the Executive is employed by the Company hereunder is hereinafter referred to as the "**Employment Term**".

2. <u>Position and Duties</u>.

   2.1 <u>Position</u>. During the Employment Term, the Executive shall serve as the President of the Company, reporting to the Chief Executive Officer of the Company (the "**CEO**"). In such position, the Executive shall have such duties, authority and responsibility as shall be determined from time to time by the Board of Directors of the Company (the "**Board**"), which duties, authority and responsibility are consistent with the Executive's position. During the Employment Term, Guarantor agrees to elect the Executive to the Board, unless the Executive objects to such an election. Within three (3) months after the Effective Date, Executive shall be appointed as an observer on




Guarantor's Board of Directors. Guarantor agrees to take all reasonable steps necessary to implement such board observation rights, subject to Japanese laws and regulations. In addition, Guarantor will nominate the Executive as a director on its Board of Directors for approval at its 2015 annual meeting of shareholders, subject to approval of the shareholders of Guarantor and Japanese laws and regulations. Upon election as a Director to Guarantor's Board of Directors, the Executive will no longer be an observer on such Board of Directors.

2.2   Duties. The Executive shall serve the Company in the position (or positions) as set forth in Section 2.1 above, fully, diligently, competently and to the best of his ability during the Employment Term and shall devote sufficient business time and attention to the performance of his duties hereunder and will not engage in any other business which would interfere with the performance of such duties without the prior written consent of the Board.

3.   Place of Performance. The principal place of the Executive's employment shall be the Executive's home office located in Boulder, Colorado or other location with remote working capabilities as may be authorized by the Board.

4.   Compensation.

4.1   Base Salary. The Company shall pay the Executive an annual rate of base salary of $300,000 in periodic installments in accordance with the Company's customary historical payroll practices. The Executive's base salary shall be reviewed at least annually by the Board and the Board may, but shall not be required to, (i) increase or (ii) enter into good faith negotiations with the Executive to decrease the base salary during the Employment Term (subject to mutual agreement of the Board and the Executive), in each case based on the financial performance of the Company. The Executive's annual base salary, as in effect from time to time, is hereinafter referred to as "**Base Salary**".

4.2   Employee Benefits. During the Employment Term, the Executive shall be entitled to participate in all employee benefit plans, practices and programs maintained by the Company, as in effect from time to time (collectively, "**Employee Benefit Plans**"), to the extent consistent with applicable law, the Company's policies and the terms of the applicable Employee Benefit Plans.

4.3   Paid Time-off. The Executive shall receive paid time-off in accordance with the Company's policies for executive officers as such policies may exist from time to time.

4.4   Business Expenses. The Executive shall be entitled to reimbursement for all reasonable and necessary out-of-pocket business, entertainment and travel expenses incurred by the Executive in connection with the performance of the Executive's duties hereunder in accordance with the Company's expense reimbursement policies and procedures.

2



5. <u>Termination of Employment</u>.  The parties may end the Employment Term in the manner set forth in **Section 1** (non-renewal) or in this **Section 5**.  Upon termination of the Executive's employment during the Employment Term, the Executive shall be entitled to the compensation and benefits described in this **Section 5** and shall have no further rights to any compensation or any other benefits from the Company or any of its affiliates except as required by law or determined by a court of competent jurisdiction.

 5.1 <u>Expiration of the Term, for Cause or Without Good Reason</u>.

  (a)  The Executive's employment hereunder may be terminated upon either party's notice of non-renewal in accordance with **Section 1**, by the Company for Cause or by the Executive without Good Reason. If the Executive's employment is terminated upon either party's notice of non-renewal, by the Company for Cause or by the Executive without Good Reason, the Executive shall be entitled to receive:

   (i) any accrued but unpaid Base Salary and accrued but unused vacation which shall be paid on the pay date immediately following the Termination Date (as defined below) in accordance with the Company's customary payroll procedures;

   (ii) reimbursement for unreimbursed business expenses properly incurred by the Executive prior to the end of the Employment Term, which shall be subject to and paid in accordance with the Company's customary expense reimbursement policy; and

   (iii) such employee benefits (including equity compensation), if any, to which the Executive may be entitled under the Company's Employee Benefit Plans as of the Termination Date; provided that, in no event shall the Executive be entitled to any payments in the nature of severance or termination payments except as specifically provided herein or otherwise agreed to by the parties hereto in writing.

Items 5.1(a)(i) through 5.1(a)(iii) are referred to herein collectively as the "**Accrued Amounts**".

  (b)  For purposes of this Agreement, "**Cause**" shall mean:

   (i) the Executive's repeated and documented failure to perform his duties (other than any such failure resulting from incapacity due to physical or mental illness), which is, in each case, injurious to the Company;

   (ii) the Executive's engagement in illegal conduct or misconduct, which is, in each case, materially injurious to the Company;

3



      (iii) the Executive's conviction for embezzlement, misappropriation or fraud; or

      (iv) the Executive's material breach of any material obligation under this Agreement.

With respect to clause (i) and (iv) above, the Company cannot terminate the Executive's employment for Cause unless the Company has first provided written notice to the Executive of the existence of the circumstances providing grounds for termination for Cause within 30 days of the Company's knowledge of the initial existence of such grounds and the Executive has had at least 30 days from the date on which such notice is provided to cure such circumstances; *provided* that no such notice and cure requirement shall apply in cases where cure is impossible.

      (c) For purposes of this Agreement, "**Good Reason**" shall mean the occurrence of any of the following, in each case during the Employment Term without the Executive's prior written consent:

      (i) any material breach by the Company of any material provision of this Agreement or any material provision of any other agreement between the Executive and the Company, the Guarantor, or any of their affiliates;

      (ii) a Change in Control;

      (iii) a material, adverse change in the Executive's authority, duties or responsibilities (other than temporarily while the Executive is physically or mentally incapacitated or as required by applicable law) compared to the Executive's authority, duties or responsibilities immediately prior to the Acquisition;

      (iv) a relocation of Executive's place of employment by more than ten (10) miles, provided and only if such change, reduction or relocation is effected by the Company without Executive's prior written consent; or

      (v) a material reduction in compensation or benefits, except as otherwise specifically permitted under this Agreement.

The Executive cannot terminate his employment for Good Reason unless he has first provided written notice to the Company of the existence of the circumstances providing grounds for termination for Good Reason within 30 days of the Executive's knowledge of the initial existence of such grounds and the Company has had at least 30 days from the date on which such notice is provided to cure such circumstances.



For purposes of this Agreement, **"Change in Control"** shall mean the occurrence after the Effective Date of (i) an acquisition of the Company or the Guarantor by an unrelated third party by means of a merger, or purchase of 50% or more of the Company's assets, or purchase of 50% or more of the Company's voting stock, or (ii) with respect to the Company only, any other reorganization or series of transactions resulting in holders of 50% or more in the ownership of the Company's voting stock before the reorganization or series of transactions holding less than 50% of the ownership of the voting stock of the surviving entity after the reorganization or series of transactions.

    5.2   Without Cause or for Good Reason. The Employment Term and the Executive's employment hereunder may also be terminated by the Executive for Good Reason or by the Company without Cause.  In the event of such termination, the Executive shall be entitled to receive the Accrued Amounts and the following:

        (a)   subject to the Executive's compliance with **Section 6**, **Section 7** and **Section 8** of this Agreement and, in the case that the Executive terminates his employment hereunder for Good Reason, his execution of a release substantially in the form of Exhibit A hereto which becomes effective within 21 days following the Termination Date, continued Base Salary for the balance of the Executive's initial four-year term contemplated in **Section 1** following the Termination Date payable in equal installments in accordance with the Company's normal payroll practices, but no less frequently than monthly, which shall commence within 21 days following the Termination Date;

        (b)   if the Company is subject to the Consolidated Omnibus Reconciliation Act of 1985 ("COBRA") and the Executive timely and properly elects continuation coverage, the Company shall reimburse the Executive for the difference between the monthly COBRA premium paid by the Executive for himself and his dependents and the monthly premium amount paid by similarly situated active executives.  Such reimbursement shall be paid to the Executive on the 15th day of the month immediately following the month in which the Executive timely remits the COBRA premium payment.  The Executive shall be eligible to receive such reimbursement until the earliest of: (i) the 12-month anniversary of the Termination Date; (ii) the date the Executive is no longer eligible to receive COBRA continuation coverage; and (iii) the date on which the Executive becomes eligible to receive substantially similar coverage from another employer at a substantially similar cost to the Executive. Notwithstanding the foregoing, if the Company making payments under this **Section 5.2(b)** would violate the nondiscrimination rules applicable to non-grandfathered plans, or result in the imposition of penalties under the Patient Protection and Affordable Care Act of 2010 and the related regulations and guidance promulgated thereunder (the **"PPACA"**), the parties agree to reform this **Section 5.2(b)** in a manner as is necessary to comply with the PPACA; and

5



(c) any other amounts as may otherwise be agreed to in writing by the parties hereto.

5.3    Death or Disability.

(a) The Executive's employment hereunder shall terminate automatically upon the Executive's death during the Employment Term, and the Company may terminate the Executive's employment on account of the Executive's Disability, as defined below.

(b) If the Executive's employment is terminated during the Employment Term on account of the Executive's death or Disability, the Executive (or the Executive's estate and/or beneficiaries, as the case may be) shall be entitled to receive the Accrued Amounts.

Notwithstanding any other provision contained herein, all payments made in connection with the Executive's Disability shall be provided in a manner which is consistent with applicable federal and state law.

(c) For purposes of this Agreement, "**Disability**" shall mean the Executive's inability, due to physical or mental incapacity, to substantially perform his duties and responsibilities under this Agreement for one hundred eighty (180) days out of any three hundred sixty-five (365) day period or failure to substantially perform his duties and responsibilities under this Agreement for six (6) consecutive months. Any question as to the existence of the Executive's Disability as to which the Executive and the Company cannot agree shall be determined in writing by a qualified independent physician mutually acceptable to the Executive and the Company. If the Executive and the Company cannot agree as to a qualified independent physician, each shall appoint such a physician and those two physicians shall select a third who shall make such determination in writing. The determination of Disability made in writing to the Company and the Executive shall be final and conclusive for all purposes of this Agreement.

5.4    Notice of Termination. Any termination of the Executive's employment hereunder by the Company or by the Executive during the Employment Term (other than termination pursuant to **Section 5.3(a)** on account of the Executive's death) shall be communicated by written notice of termination ("**Notice of Termination**") to the other party hereto in accordance with **Section 21**. The Notice of Termination shall specify:

(a) The termination provision of this Agreement relied upon;

(b) To the extent applicable, the facts and circumstances claimed to provide a basis for termination of the Executive's employment under the provision so indicated; and

(c) The applicable Termination Date.

6



5.5    Termination Date. The Executive's Termination Date shall be:

(a)    If the Executive's employment hereunder terminates on account of the Executive's death, the date of the Executive's death;

(b)    If the Executive's employment hereunder is terminated on account of the Executive's Disability, the date that it is determined by the parties that the Executive has a Disability, or, there is a question as to the existence of the Executive's Disability as to which the Executive and the Company cannot agree, the date that is determined by a qualified independent physician as defined in **Section 5.3(c)**;

(c)    If the Company terminates the Executive's employment hereunder for Cause in accordance with the terms and conditions of this Agreement, the date the Notice of Termination is delivered to the Executive;

(d)    If the Company terminates the Executive's employment hereunder without Cause, the date specified in the Notice of Termination, which shall be no less than 30 days following the date on which the Notice of Termination is delivered; provided that, the Company shall have the option to provide the Executive with a lump sum payment equal to 30 days' Base Salary in lieu of such notice, which shall be paid in a lump sum on the date the Notice of Termination is delivered, and for all purposes of this Agreement, the Executive's Termination Date shall be the date of the Notice of Termination;

(e)    If the Executive terminates his employment hereunder with or without Good Reason, the date specified in the Executive's Notice of Termination, which shall be no less than 30 days following the date on which the Notice of Termination is delivered; provided that, the Company shall have the option to waive all or any part of the 30-day notice period for no consideration by giving written notice to the Executive and for all purposes of this Agreement, the Executive's Termination Date shall be the date determined by the Company; and

(f)    If the Executive's employment hereunder terminates because either party provides notice of non-renewal pursuant to **Section 1**, the Renewal Date immediately following the date on which the applicable party delivers notice of non-renewal.

Notwithstanding anything contained herein, the Termination Date shall not occur until the date on which the Executive incurs a "separation from service" within the meaning of Section 409A of the Internal Revenue Code, as amended ("**Section 409A**").

5.6    Resignation of All Other Positions.    Upon termination of the Executive's employment hereunder for any reason, the Executive shall be deemed to have resigned, and shall, at the request of the Board, provide his resignation, from all positions that the Executive holds as an officer or member of the Board of Directors (or a committee



thereof) of the Company or any of its affiliates, unless otherwise agreed in writing by the parties hereto.

5.7 [Reserved.]

6. Confidential Information. The Executive understands and acknowledges that during the Employment Term, he will have access to and learn about Confidential Information, as defined below.

6.1 Confidential Information Defined.

(a) Definition.

For purposes of this Agreement, "**Confidential Information**" includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating to: business processes, practices, methods, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, know-how, trade secrets, computer software, software design, work-in-process, databases, manuals, systems, financial information, marketing information, pricing information, unpublished patent applications, discoveries, experimental processes, customer information, partner information, of the Company and its affiliates (the "**Company Group**") or its businesses, or of any other person or entity that has entrusted information to the Company in confidence. Notwithstanding the foregoing, "Confidential Information" shall not include information which is (i) generally known in the Company's industry; (ii) not gained as a result of a breach of this **Section 6**; and (iii) Executive's own skill, knowledge, know-how and experience.

The Executive understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

The Executive understands and agrees that Confidential Information includes information developed by him in the course of his employment by the Company as if the Company furnished the same Confidential Information to the Executive in the first instance. Confidential Information shall not include information that is generally available to and known by the public at the time of disclosure to the Executive; provided that, such disclosure is through no direct or indirect fault of the Executive or person(s) acting on the Executive's behalf.

(b) Company Creation and Use of Confidential Information.

The Executive understands and acknowledges that the Company Group has invested, and continues to invest, substantial time, money and specialized knowledge

8



into developing its resources, creating a customer base, generating customer and potential customer lists, training its employees, and improving its offerings in the field of Internet and social media data aggregation. The Executive understands and acknowledges that as a result of these efforts, the Company Group has created, and continues to use and create Confidential Information. This Confidential Information provides the Company Group with a competitive advantage over others in the marketplace.

 (c) <u>Disclosure and Use Restrictions</u>.

  Notwithstanding anything to the contrary herein, at all times during and after the term of this Employment Agreement and for a period of five (5) years following the last day of the Executive's employment with the Company, Executive will keep in confidence and trust, and will not use or disclose, any Confidential Information (except in the course of his employment under this Agreement and in furtherance of the business of the Company or any of its affiliates or subsidiaries) without the prior written consent of the Board.

7. <u>Restrictive Covenants</u>.

 7.1 <u>Acknowledgment</u>. The Executive understands that the nature of the Executive's position gives him access to and knowledge of Confidential Information and places him in a position of trust and confidence with the Company Group. The Executive understands and acknowledges that the intellectual and technical services he provides to the Company Group are unique, special or extraordinary because he is the founder and current Chief Executive Officer of the Company and is uniquely familiar with its business, technology and employees.

  The Executive further understands and acknowledges that the Company Group's ability to reserve these for the exclusive knowledge and use of the Company Group is of great competitive importance and commercial value to the Company Group, and that improper use or disclosure by the Executive is likely to result in unfair or unlawful competitive activity.

 7.2 <u>Non-competition</u>. Because of the Company Group's legitimate business interest as described herein and the good and valuable consideration offered to the Executive, during the Employment Term and for a period of twelve (12) months following the last day of the Executive's employment with the Company, the Executive agrees and covenants not to engage in Prohibited Activity within the Territory. Notwithstanding the foregoing sentence, if the Company terminates the Executive's employment at any time without Cause or the Executive terminates his employment at any time for Good Reason, such non-competition obligation shall continue only for so long as the Company is paying the Executive the amounts specified in **Section 5.2(a)**. If the Company defaults on its payment obligations as specified in **Section 5.2(a)**, then the Executive's non-competition obligation under this **Section 7.2** will immediately cease and terminate. In the event that

9



the Company provides written notice of its intention not to extend the term of this Agreement following the initial four-year term contemplated in **Section 1**, then upon the expiration of such initial four-year term, the Executive's non-competition obligations under this **Section 7.2** will immediately cease and terminate. For the purposes of this Agreement, **"Territory"** shall mean Japan and North America.

For purposes of this **Section 7**, **"Prohibited Activity"** is activity in which the Executive contributes his knowledge, directly or indirectly, in whole or in part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, employee, partner, director, stockholder, officer, volunteer, intern or any other similar capacity to an entity engaged in the same or substantially similar business as the Company Group, Prohibited Activity also includes activity that has a substantial likelihood of requiring disclosure of trade secrets, proprietary information or Confidential Information.

The Company Group regards as its primary, but not exclusive, competitors the following: Gnip, Inc and MediaSift Ltd.

Nothing herein (including **Section 7.5** below) shall prohibit the Executive from purchasing or owning less than five percent (5%) of the publicly traded securities of any corporation substantially involved in a Prohibited Activity, provided that such ownership represents a passive investment and that the Executive is not a controlling person of, or a member of a group that controls, such corporation. For purposes of clarification, the Executive is not prohibited from purchasing securities of any corporation that is not substantially involved in a Prohibited Activity or participating in the management and control of such a corporation.

This **Section 7** does not, in any way, restrict or impede the Executive from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation or order. The Executive shall promptly provide written notice of any such order to the CEO and the Chairman of the Board of Directors.

7.3  <u>Non-Solicitation of Employees</u>.  During the Employment Term and for a period of eighteen (18) months following the last day of the Employment Term, the Executive agrees and covenants not to directly or indirectly solicit, hire, recruit, attempt to hire or recruit, or induce the termination of employment of any employee of the Company Group. Notwithstanding the foregoing, if the Company terminates the Executive's employment at any time without Cause or the Executive terminates his employment at any time for Good Reason, such non-solicitation obligation shall continue only for so long as the Company is paying the Executive the full amounts specified in **Section 5.2(a)**.

10



If the Company defaults on its payment obligations as specified in **Section 5.2(a)**, then the Executive's non-solicitation obligation under this **Section 7.3** will immediately cease and terminate.

7.4   <u>Non-Solicitation of Customers</u>. The Executive understands and acknowledges that because of the Executive's experience with and relationship to the Company Group, he will have access to and learn about much or all of the Company Group's customer information. **"Customer Information"** includes, but is not limited to, names, phone numbers, addresses, e-mail addresses, order history, order preferences, chain of command, pricing information and other information identifying facts and circumstances specific to the customer and relevant to sales.

The Executive understands and acknowledges that misappropriation of the Company's Customer Information will cause significant and irreparable harm.

During the Employment Term and for a period of twelve (12) months following the last day of the Employment Term, the Executive agrees not to directly or indirectly solicit, contact (including but not limited to e-mail, regular mail, express mail, telephone, fax, and instant message), attempt to contact or meet with the Company's current or prospective customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the Company. Notwithstanding the foregoing, if the Company terminates the Executive's employment at any time without Cause or the Executive terminates his employment at any time for Good Reason, such non-solicitation obligation shall continue only for so long as the Company is paying the Executive the full amounts specified in **Section 5.2(a)**. If the Company defaults on its payment obligations as specified in **Section 5.2(a)**, then the Executive's non-solicitation obligation under this **Section 7.4** will immediately cease and terminate.

7.5   <u>Sale of Business Non-Compete and Non-Solicit</u>. In addition to the obligations of the Executive set forth above in this **Section 7**, in recognition of the benefits and good and valuable consideration received by the Executive in connection with the Guarantor's purchase of the Company from the Executive and the Company's other shareholders under the Definitive Agreement, and because of the Guarantor's legitimate business interest, for a period of four (4) years following the Closing Date (as such term is defined in the Definitive Agreement), the Executive agrees and covenants not to:

(a)   engage in Prohibited Activity within the Territory;

(b)   directly or indirectly solicit, hire, recruit, attempt to hire or recruit, or induce the termination of employment of any employee of the Company Group; or

(c)   directly or indirectly solicit, contact (including but not limited to e-mail, regular mail, express mail, telephone, fax, and instant message), attempt to contact or

11



meet with the Company's current or prospective customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the Company.

8. <u>Non-Disparagement</u>. The Executive agrees and covenants that he will not at any time the term of this Employment Agreement and for a period of two (2) years following the last day of the Executive's employment with the Company (or, if longer, the period during which the Company is paying the Executive the full amounts specified in **Section 5.2(a)**) make, publish or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments or statements concerning the Company Group or its businesses, or any of its employees, officers, and existing and prospective customers, suppliers, investors and other associated third parties.

The Company Group (for purposes of this **Section 8**, the Company Group shall mean the Company Group together with its executive officers and directors) agrees and covenants that it will not will not at any time during the term of this Employment Agreement and for a period of two (2) years following the last day of the Executive's employment with the Company make, publish or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments or statements regarding the Executive.

This **Section 8** does not, in any way, restrict or impede the Executive or the Company from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation or order. The Executive shall promptly provide written notice of receipt of any such order to the Board of Directors of the Company. The Company Group shall promptly provide written notice of receipt of any such order to the Executive.

9. <u>Acknowledgement</u>. The Executive acknowledges and agrees that the services to be rendered by him to the Company are of a special and unique character; that the Executive will obtain knowledge and skill relevant to the Company's industry, methods of doing business and marketing strategies by virtue of the Executive's employment; and that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interest of the Company Group.

10. <u>Remedies</u>. In the event of a breach by the Executive of **Section 6**, **Section 7** or **Section 8** of this Agreement, the Executive hereby consents and agrees that the Company shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages or that money damages would not afford an adequate remedy, and without the

12




necessity of posting any bond or other security. The aforementioned equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages or other available forms of relief.

11. <u>Proprietary Rights</u>.

11.1 <u>Work Product</u>. The Executive acknowledges and agrees that all writings, works of authorship, technology, inventions, discoveries, ideas and other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived or reduced to practice by the Executive individually or jointly with others during the period of his employment by the Company and relating in any way to the business or contemplated business, research or development of the Company (regardless of when or where such work is prepared or whose equipment or other resources is used in preparing the same) and all printed, physical and electronic copies, all improvements, rights and claims related to the foregoing, and other tangible embodiments thereof (collectively, **"Work Product"**), as well as any and all rights in and to copyrights, trade secrets, trademarks (and related goodwill), patents and other intellectual property rights therein arising in any jurisdiction throughout the world and all related rights of priority under international conventions with respect thereto, including all pending and future applications and registrations therefor, and continuations, divisions, continuations-in-part, reissues, extensions and renewals thereof (collectively, **"Intellectual Property Rights"**), shall be the sole and exclusive property of the Company.

For purposes of this Agreement, Work Product includes, but is not limited to, Company Group information, including plans, research, strategies, techniques, agreements, documents, know-how, computer programs, software design, work in process, databases, manuals, market studies, communications, algorithms, product plans, inventions, unpublished patent applications, original works of authorship, discoveries, customer information, customer lists, marketing information, and sales information.

11.2 <u>Work Made for Hire; Assignment</u>. The Executive acknowledges that, by reason of being employed by the Company at the relevant times, to the extent permitted by law, all of the Work Product consisting of copyrightable subject matter is "work made for hire" as defined in 17 U.S.C. § 101 and such copyrights are therefore owned by the Company. To the extent that the foregoing does not apply, the Executive hereby irrevocably assigns to the Company, for no additional consideration, the Executive's entire right, title and interest in and to all Work Product and Intellectual Property Rights therein, including the right to sue, counterclaim and recover for all past, present and future infringement, misappropriation or dilution thereof, and all rights corresponding thereto throughout the world. Nothing contained in this Agreement shall be construed to reduce or limit the Company's rights, title or interest in any Work Product or Intellectual Property Rights so as to be less in any respect than that the Company would have had in the absence of this Agreement.

13



11.3 <u>Further Assurances; Power of Attorney</u>. During and after his employment, the Executive agrees to reasonably cooperate with the Company to (a) apply for, obtain, perfect and transfer to the Company the Work Product as well as an Intellectual Property Right in the Work Product in any jurisdiction in the world; and (b) maintain, protect and enforce the same, including, without limitation, executing and delivering to the Company any and all applications, oaths, declarations, affidavits, waivers, assignments and other documents and instruments as shall be requested by the Company. The Executive hereby irrevocably grants the Company a durable power of attorney, which shall not be affected or extinguished by Executive's Disability, to execute and deliver any such documents on the Executive's behalf in his name and to do all other lawfully permitted acts to transfer the Work Product to the Company and further the transfer, issuance, prosecution and maintenance of all Intellectual Property Rights therein, to the full extent permitted by law, if the Executive does not promptly cooperate with the Company's request (without limiting the rights the Company shall have in such circumstances by operation of law). The durable power of attorney is coupled with an interest and shall not be affected by the Executive's subsequent incapacity.

11.4 <u>No License</u>. The Executive understands that this Agreement does not, and shall not be construed to, grant the Executive any license or right of any nature with respect to any Work Product or Intellectual Property Rights or any Confidential Information, materials, software or other tools made available to him by the Company.

12. <u>Security</u>.

12.1 <u>Exit Obligations</u>. Upon (a) termination of the Executive's employment or (b) the Company's request at any time during the Executive's employment, the Executive shall (i) provide or return to the Company any and all Company Group property and all Company Group documents and materials belonging to the Company and stored in any fashion, including but not limited to those that constitute or contain any Confidential Information or Work Product, that are in the possession or control of the Executive, whether they were provided to the Executive by the Company Group or any of its business associates or created by the Executive in connection with his employment by the Company; and (ii) delete or destroy all copies of any such documents and materials not returned to the Company that remain in the Executive's possession or control, including those stored on any non-Company Group devices, networks, storage locations and media in the Executive's possession or control.

13. <u>Governing Law; Jurisdiction and Venue</u>. This Agreement, for all purposes, shall be construed in accordance with the laws of the State of Michigan without regard to conflicts of law principles. Any action or proceeding by either of the parties to enforce this Agreement shall be brought only in a state or federal court located in Oakland County, Michigan. The parties hereby irrevocably submit to the exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue.

14



14. Entire Agreement. Unless specifically provided herein, this Agreement contains all of the understandings and representations between the Executive and the Company pertaining to the subject matter hereof and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter. The parties mutually agree that the Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of the Agreement.

15. Modification and Waiver. No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by the Executive and by the CEO. No waiver by either of the parties of any breach by the other party hereto of any condition or provision of this Agreement to be performed by the other party hereto shall be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either of the parties in exercising any right, power or privilege hereunder operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power or privilege.

16. Severability. Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement.

The parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by law.

The parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had not been set forth herein.

15



17. <u>Captions</u>. Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

18. <u>Counterparts</u>. This Agreement may be executed in separate counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

19. <u>Section 409A</u>.

19.1 <u>General Compliance</u>. This Agreement is intended to comply with Section 409A or an exemption thereunder and shall be construed and administered in accordance with Section 409A. Notwithstanding any other provision of this Agreement, payments provided under this Agreement may only be made upon an event and in a manner that complies with Section 409A or an applicable exemption. Any payments under this Agreement that may be excluded from Section 409A either as separation pay due to an involuntary separation from service or as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each installment payment provided under this Agreement shall be treated as a separate payment. Any payments to be made under this Agreement upon a termination of employment shall only be made upon a "separation from service" under Section 409A. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this Agreement comply with Section 409A.

19.2 <u>Specified Employees</u>. Notwithstanding any other provision of this Agreement, if any payment or benefit provided to the Executive in connection with his termination of employment is determined to constitute "nonqualified deferred compensation" within the meaning of Section 409A and the Executive is determined to be a "specified employee" as defined in Section 409A(a)(2)(b)(i), then such payment or benefit shall not be paid until the first payroll date to occur following the six-month anniversary of the Termination Date (the "**Specified Employee Payment Date**") or, if earlier, on the Executive's death. The aggregate of any payments that would otherwise have been paid before the Specified Employee Payment Date shall be paid to the Executive in a lump sum on the Specified Employee Payment Date and thereafter, any remaining payments shall be paid without delay in accordance with their original schedule.

19.3 <u>Reimbursements</u>. To the extent required by Section 409A, each reimbursement or in-kind benefit provided under this Agreement shall be provided in accordance with the following:

(a) the amount of expenses eligible for reimbursement, or in-kind benefits provided, during each calendar year cannot affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other calendar year;

16



(b)  any reimbursement of an eligible expense shall be paid to the Executive on or before the last day of the calendar year following the calendar year in which the expense was incurred; and

(c)  any right to reimbursements or in-kind benefits under this Agreement shall not be subject to liquidation or exchange for another benefit.

19.4 Tax Gross-ups. Any tax gross-up payments provided under this Agreement shall be paid to the Executive on or before December 31 of the calendar year immediately following the calendar year in which the Executive remits the related taxes.

20. Successors and Assigns. This Agreement is personal to the Executive and shall not be assigned by the Executive. Any purported assignment by the Executive shall be null and void from the initial date of the purported assignment. The Company may assign this Agreement to any successor or assign (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Company. This Agreement shall inure to the benefit of the Company and permitted successors and assigns.

21. Notice. Notices and all other communications provided for in this Agreement shall be in writing and shall be delivered personally or sent by registered or certified mail, return receipt requested, or by overnight carrier to the parties at the addresses set forth below (or such other addresses as specified by the parties by like notice):

If to the Company:

Effyis, Inc.
700 Tower Drive, Suite 140
Troy, Michigan 48098
Attention: Scott Purdon
Facsimile: +1-248-813-8718

If to the Executive:

Darren Kelly
1144 Green Circle
Boulder, CO 80305

22. Representations of the Executive. The Executive represents and warrants to the Company that:

22.1 The Executive's acceptance of employment with the Company and the performance of his duties hereunder will not conflict with or result in a violation of, a



breach of, or a default under any contract, agreement or understanding to which he is a party or is otherwise bound.

22.2 The Executive's acceptance of employment with the Company and the performance of his duties hereunder will not violate any non-solicitation, non-competition or other similar covenant or agreement of a prior employer.

23. Guarantee. The obligations of the Company under this Agreement, including without limitation payment obligations, shall be guaranteed by the Guarantor.

24. Insurance. The Company agrees to maintain director and officer liability insurance for the Executive under a plan selected by the Executive, including Side A Coverage with limits of $1 million per occurrence and aggregate with defense costs outside the limits, at a cost not to exceed $5,000 per year (or a greater amount if agreed by the Company).

25. Indemnification. The Company hereby agrees to indemnify the Executive and hold him harmless to the fullest extent permitted by law and the Company's organizational documents and bylaws against and in respect to any and all actions, suits, proceedings, claims, demands, judgments, costs, expenses (including reasonable attorneys' fees), losses and damages resulting from the Executive's performance of his duties and obligations with the Company. The Company will advance to the Executive all reasonable attorney fees and costs necessary to defend any action. Subject to applicable law, in no event shall the indemnity provided by the Company to the Executive be less than the maximum indemnity provided by the Company to any other director or officer under an indemnification insurance policy or the bylaws or other organizational documents of the Company. This indemnification provision survives the Executive's employment with the Company

26. Withholding. The Company shall have the right to withhold from any amount payable hereunder any federal, state and local taxes in order for the Company to satisfy any withholding tax obligation it may have under any applicable law or regulation.

27. Survival. Upon the expiration or other termination of this Agreement, the respective rights and obligations of the parties hereto shall survive such expiration or other termination to the extent necessary to carry out the intentions of the parties under this Agreement.

28. Acknowledgment of Full Understanding. THE EXECUTIVE ACKNOWLEDGES AND AGREES THAT HE HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT. THE EXECUTIVE ACKNOWLEDGES AND AGREES THAT HE HAS HAD AN OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF HIS CHOICE BEFORE SIGNING THIS AGREEMENT.



[SIGNATURE PAGE FOLLOWS]

19



IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

EFFYIS, INC.

By: _____

Name: Scott Purdon

Title: Chief Executive Officer

EXECUTIVE

Signature: _____

Print Name: Darren Kelly

HOTTO LINK INC.

By: _____

Name: Koki Uchiyama
Title: Chief Executive Officer

Exhibit A

Form of Release

WHEREAS, there has been a termination of the Employment Agreement (the "Agreement") made and entered into on January __, 2015 between the undersigned (the "Executive") and Effyis, Inc. (the "Company") of the Executive's employment from the Company for "Good Reason," as those terms are defined in the Agreement; and

WHEREAS, the Executive is required to sign this Release in order to receive the severance benefits described in Section 5.2(a) of the Agreement.

NOW THEREFORE, in consideration of the promises and agreements contained herein and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, and intending to be legally bound, the Executive and the Company (each individually referred to herein as a "Party" and together referred to herein as the "Parties") agree as follows:

1.      This Release is effective on the date hereof and will continue in effect as provided herein.

2.      In consideration of the payments to be made and the benefits to be received by the Executive pursuant to Section 5.2(a) of the Agreement, which the Executive acknowledges are in addition to payments and benefits which the Executive would be entitled to receive absent the Agreement, and in consideration of the Executive entering into this Release, each Party hereto mutually releases and forever discharges one another, and their respective affiliates, subsidiaries, partners, members, shareholders, managers, successors, assigns, directors, officers, employees, agents, attorneys, subcontractors, consultants and representatives from the following employment-related arbitrations, claims, including claims for attorneys' fees, demands, damages, suits, proceedings, actions and/or causes of action of any kind and every description, whether known or unknown, which each Party now has or may have had for, upon, or by reason of any cause whatsoever ("claims"):

(a)      any and all claims arising out of or relating to Executive's employment by or service with the Company and his termination from the Company;

(b)      any and all claims of discrimination, including but not limited to claims of discrimination on the basis of sex, race, age, national origin, marital status, religion or handicap, including, specifically, but without limiting the generality of the foregoing, any claims under the Age Discrimination in Employment Act, as amended, Title VII of the Civil Rights Act of 1964, as amended, the Americans with Disabilities Act, The Elliott-Larsen Civil Rights Act, the Michigan Handicappers' Civil Rights Act, the Michigan Wage Payment Act (MCLA Section 408.471), the Polygraph Protection Act of 1981, the Michigan Whistleblower's Protection Act (MCLA Section 15.361), the common law of the State of Michigan, and any other applicable state statutes and regulations, and



(c) any and all claims of wrongful or unjust discharge or breach of any contract or promise, express or implied;

provided, however, that the foregoing shall not apply to claims to enforce rights or other causes of action that Executive may have as of the date hereof or in the future under or related to any of the Company's health, welfare, retirement, pension or incentive plans, under or related to any stock options or stock issuance, in connection with any personal injury or workers' compensation claims, under any indemnification agreement or other agreement between the Executive and the Company (including any applicable provisions of the Agreement), under the Company's indemnification by-laws, under the directors' and officers' liability coverage maintained by the Company, in connection with any defenses, counterclaims or interpleader action the Executive may otherwise have with respect to future litigation or other proceedings in which the Executive is the defendant/respondent, under the applicable provisions of the Michigan Business Corporation Act or any securities laws, in connection with any illegal activity of the Company or request from the Company to the Executive to undertake an illegal activity, or that Executive may otherwise have in the future under Section 5.2(a) of the Agreement or under this Release.

3. Each Party understands and acknowledges that Executive and the Company do not admit any violation of law, liability or invasion of any of his or its rights and that any such violation, liability or invasion is expressly denied. The consideration provided for this Release is made for the purpose of settling and extinguishing all claims and rights (and every other similar or dissimilar matter) that the Parties ever had or now may have against one another to the extent provided in this Release. Each Party further agrees and acknowledges that no representations, promises or inducements have been made by Executive or the Company other than as appear in the Agreement.

4. Executive further agrees and acknowledges that:

(a) The release provided for herein releases claims to and including the date of this Release;

(b) He has been advised by the Company to consult with legal counsel prior to executing this Release, has had an opportunity to consult with and to be advised by legal counsel of his choice, fully understands the terms of this Release, and enters into this Release freely, voluntarily and intending to be bound;

(c) He has been given a period of twenty-one (21) days to review and consider the terms of this Release, prior to its execution and that he may use as much of the twenty-one (21) day period as he desires; and

(d) He may, within 7 days after execution, revoke this Release. Revocation shall be made by delivering a written notice of revocation to _____ at [Effyis, Inc./Guarantor]. For such revocation to be effective, written notice must be actually received by _____ at [Effyis, Inc./Guarantor] no later than the close of business on the 7th day after Executive executes this Release. If Executive does exercise



his right to revoke this Release, all of the terms and conditions of the Release shall be of no force and effect and Effyis, Inc. shall not have any obligation to make further payments under Section 5.2(a) of the Agreement.

5.  Executive and the Company agree that they will never file a lawsuit or other complaint asserting any claim that is released in this Release.

6.  Executive waives and releases any claim that he has or may have to reemployment after the Termination Date as defined in the Agreement.

IN WITNESS WHEREOF, the Parties have executed and delivered this Release on the date set forth below.

Executive:

Dated:_____        _____

The Company:

Dated:_____        By:_____

                                 Name:_____

                                 Title:_____

3

